Good morning, Your Honors, and may it please the Court, Josh Arison of Bursar and Fisher on behalf of the appellants. I'll endeavor to save two minutes for rebuttal. Okay, we'll try to help you, but keep your eye on the clock. I will. Thank you. The District Court committed three fundamental errors that require reversal in this case. First, the District Court erroneously held that the Communications Decency Act, the CDA, bars plaintiffs' claims based on Twitter's provision of social media accounts to ISIS. And this was an error because the CDA only bars claims that seek to hold a defendant liable as a publisher, and the provision of social media accounts is not a publishing activity for purposes of the CDA. I thought the District Court cited some cases to that effect, though, that I think there was a First Circuit case that he cited and perhaps others to the effect that even the account where you have the handle on it is in and of itself a publishing. What's wrong with that? Well, I think you're talking about the Backpage.com case from the First Circuit, Your Honor. And while the complaint in that case did try to frame itself as about the structure and operation of a website, even the plaintiffs in that case admitted that it was really about the kind of content that was allowed on that website. They said that Backpage.com was allowing phone numbers and e-mail addresses and photos, and that facilitated. You're getting farther down the line than I thought the district judge did. I thought that he said that the very act of being a publisher is to determine whether people are going to be permitted to be on your site, just like a newspaper would do. The fact that you're going to have your name out there and some kind of a handle, that's a discrimination. In short, any type of a decision, in this case by Twitter, whether to permit an account is in and of itself a publishing decision. Well, I don't think that's correct, Your Honor, because this Court has said in the Barnes v. Yahoo decision that publication for purposes of the CDA is reviewing, editing, and deciding whether to publish specific content. Well, it isn't just that, perhaps. It certainly is that, but the question is whether the very establishment of an account and giving somebody a handle is in and of itself a publishing decision. Does it go that far? I don't think it is a publishing decision, because handing someone a tool that can be used to create content is not the same as disseminating content. If you give someone a typewriter, that's not the same thing as saying, well, now you can publish an op-ed piece in my newspaper. These are really separate and distinct activities. And in addition... Do you have any case law that says that? Well, I do think this is an issue of first impression on that, and so there aren't really cases to point to either way on that, but... You know, it's awful, it struck me as it's awful difficult to know in advance, of course, who's applying for accounts. Don't you have a much stronger case talking about once you're aware of how the means is being used? In other words, I thought your theory was, look, ISIS is using Twitter as a command and control means. They know it, and they are allowing ISIS to continue to command and control their troops using this means. It doesn't matter what they say. Blow up this, don't blow up that, meet here. It doesn't matter the content. It matters that the means of command and control is being provided. That's correct. Don't you have a strong argument about maintaining that ability to command and control as opposed to initially establishing accounts? Well, the distinction we're trying to make here is that the violation of the Anti-Terrorism Act depends on the provision of the tool, provision of the accounts, not how ISIS uses those. Well, provision of the accounts, to me, aren't you limiting yourself a little too much? Because provision of the account is difficult to know, right? But maintaining an account once you know, isn't that something different? Well, it's both. And the way I use provision of accounts includes the maintaining of accounts. And I think one way to understand that there's a separation here between giving them access to the service and the creation of content with that service is the fact that account creation is not necessarily tied to content creation on Twitter. Why is maintaining the account once you know they're being used? Why does that have to be tied to content distribution? Well, our point is that it's not tied to content distribution, and that's why the CDA does not apply. Your whole theory doesn't survive if it's tied to content, right? Well, we certainly rely on content for purposes of causation, and I'm happy to get into that. But the breach of the duty. You have to because that's your problem. You're hoisted up on your own petard because if there is no content, then how do you get to the foreseeability? How do you get to the causation? I don't see how you're doing it, but I'm interested to hear your argument. Well, we start with where the breach of the duty occurs here. And if you look at the Anti-Terrorism Act and the statutes at issue there, there's 18 U.S.C. 2339 big A. Can you start with 2333A, which is what you're actually claiming here, right? That there was a violation that you can bring an action under 2333A. Am I wrong? Well, 2333A creates a private cause of action. Okay. So can you walk through that for me? Yes. It gives rise to a private cause of action when there has been a violation of the material support statute. But it doesn't say that. It says by reason of an act of international terrorism, and then it defines what an act of international terrorism is. Right. So can you step through that for me? Well, courts have held that when you violate 2339A and B, those are acts of international terrorism. Okay, not in our circuit. And some circuits have come out the other way. So we have to decide that for ourselves. So maybe you can explain that. I think the vast majority of courts have held that when those material support statutes are violated, that is an act of international terrorism. So are you conceding that it doesn't, the acts you're alleging here don't meet the definition in 2331A.1, what the term international terrorism means? Well, we certainly don't allege that Twitter was going out and planting bombs or they gave the bullets to the shooter. So it doesn't meet the definition of international terrorism. I think it meets the definition of international terrorism that has been adopted by the majority of courts. So we would have to say that notwithstanding the language of the statute, we will say that 2339A, which doesn't even use that language, which is an act of international terrorism, is an act of international terrorism. Is that what we would have to do? Well, on top of that, Your Honor, since while this case. Could you just tell me if that's what we would have to do? Yes, I'm explaining. Congress passed an amendment to the Anti-Terrorism Act, which applies retroactively to currently pending cases, the Justice Against Sponsors of Terrorism Act, which specifically creates secondary liability. I saw that. And why didn't you pursue that? I think didn't the district court give you an opportunity to pursue that, which seems to fit a lot better than A? Well, the timing is not exactly clear right now, but I believe it might have been passed after the time for amending in this case had passed. But the ---- But that seems to actually have a ---- it's very difficult to understand D, but it actually makes more sense in this context. You know, a person who aids an abet by knowingly providing substantial assistance, though it doesn't say to whom, you have to guess. But that seems to be more what you're arguing here, right? Well, it does perhaps fit better into a claim of aiding and abetting or possibly conspiracy. And given the retroapplication of JASTA, I would say that it applies here. But in terms of separating account creation from content, I think ---- But we don't even get there until we're looking ---- you've established that you were injured by reason of an act of international terrorism. I mean, that's just a defense to that. So I'm concerned about how we even get to that there's ---- you have a right under 2333A. That's why I was asking you to walk through it. Well, I would ---- my answer to that, I think, would be that that was not the basis for the decision in the district court. I think the district court should be permitted to address that in the first instance if that's going to be a sticking point. And do you want to address by reason of or you don't want to address that? For the ---- for proximate causation? Yes. Yes. Because the district court clearly did address that and said there you have to show proximate cause under the ATA and said that it wasn't shown here. So I don't think you're correct that the district court didn't review whether you met the requirements of 2333A. Well, the vast majority of courts that have addressed the standard for proximate causation under the Anti-Terrorism Act have ruled that there's no requirement of directness. You don't have to show that there's no need to trace specific provision of material support to a specific attack. And in cases involving financial contributions to terrorism, that's perhaps a little bit clearer because money is fungible. You can't say, well, I gave money to the charitable wing of this terrorist organization, and so that's different from the money that was used by the militant wing. So you're saying by reason of it doesn't really have any meaning here because there doesn't have to be any connection at all. So any support to any terrorist organization in any way, if the terrorist organization somewhere else, some other arm of it, causes an injury, you don't have to show any connection between the support and the injury? Well, the non-financial material support given to terrorist groups is really just as fungible as money, and in fact the Supreme Court held in the Humanitarian Law Project case that all forms of support to terrorists help facilitate terrorist attacks. Is there any relationship between the use of Twitter here and the particular attack? So you're correct. We do not allege that the perpetrator here had a Twitter account or was specifically aided by Twitter, but under the precedent of other courts that have addressed proximate causation, all you really have to show is that the defendant helped the terrorist organization and then the terrorist organization carried out the attack. Now, there are some limitations based on how substantial the support is and temporal limitations. Under that argument, though, doesn't every company that has any resemblance to Twitter, like Google, Microsoft, Facebook, you name it, phone companies, aren't they all going to be bankrupt in about 20 days because you'll sue them because their very existence or somebody has an account that they know happens to be from ISIS, you're saying that they made it possible, and yet there's no connection to any specific act. There's no allegation in this act that Twitter played any role at all, that any of these people had anything to do with this particular act of terrorism. Can that really be what Congress intended under 230 of the Communications Decency Act or the ATA itself? Well, there are two responses to that. The first is that there's a very important limiting factor under the Anti-Terrorism Act, which is its Santa requirement. Unless you're knowingly giving material support to a terrorist, you can't be held liable. And thankfully, it's not an occurrence that happens every day that American companies are knowingly providing support to terrorists. But you're arguing, though, counsel, that anybody, you know, let's take a phone company. If they know, based on your claim, that there's an ISIS member who's using that account, content neutral, they don't know, might be talking about Mother's Day, I don't know. They're liable, according to your theory. Can that possibly be what Congress intended? Well, I think that turns on the fact that Twitter has been extremely instrumental to the rise of ISIS here. And without Twitter, the – What evidence do you cite for that? Well, we have – Not that they have accounts, but what evidence do you cite in your complaint that shows that Twitter has used – has been used by ISIS to cause specific acts of terrorism? Well, Twitter used ISIS to great effect. They used it to recruit thousands of new members. They used it to fundraise millions of dollars. Twitter used ISIS to that effect? ISIS used Twitter to that effect. Shame on them. And ISIS used Twitter to spread its propaganda worldwide. And so this all enabled ISIS to amass a significant number of resources. But then you're getting to content. Then you're getting to content. So if you're saying that just establishing the account is enough, then you get to the question that the district judge wrestled with. But once you get to content and you're saying that Twitter permitted them to put certain content in there, then they're publishers. That's really clear under almost any case law, are they not? No, I think that under the Internet Brands case and the Barnes v. Yahoo case, those cases stand for the proposition that there are limits to this CDA. It's not – it doesn't create general – Those cases are an opposite to this, are they not? I don't think so. It's particularly the Barnes case where Yahoo promised to remove offensive content from its website that the plaintiff's ex-boyfriend had posted, nude pictures and such. And Yahoo then didn't bring it down. So that was a promissory estoppel case, and clearly it was based on content. There's no harm in that case based on content. And this court held that the CDA didn't apply because the duty was independent there of Yahoo's duty as a publisher. The duty stemmed from the promises that it made to plaintiff. And similarly here, the duty stems not from Twitter's role as a publisher, but from its independent duty under Federal statute, the Anti-Terrorism Act. Okay. Because this is really an important case, if I could ask my colleagues' indulgence, why don't you have a seat? Let's hear from opposing counsel. We'll give you some time afterwards that we'll have an opportunity to ask additional questions, if that's okay. Thank you. Okay. Mr. Waxman, good morning. May it please the Court. I am Seth Waxman, representing Twitter in this case. And before I get into the substance of my argument, Judge Okuda, on pages 51 and 52 of our brief, note 6, we cite to the district court record where counsel for Ms. Fields was asked by Judge Orrick and specifically waived reliance, waived any need to a further amendment to add the aiding and abetting provision of JASTA, contending and conceding that it would be barred by Section 230. As to the merits of the case, there is simply no theory for holding Twitter liable in this case, other than its role and its duty as a publisher. Decisions about which particular third parties may have accounts on its platform, in other words, who to block from supplying content on the Twitter platform, is clear publishing activity. This Court in Barnes explained that Section 230 immunity applies when, quote, the duty the plaintiff alleges the defendant violated derives from the defendant's status as a publisher or speaker. Here, the alleged duty is control over who Twitter allows to speak and publish on its publishing platform. That is paradigmatically what publishers do, just as Judge Smith observed in the topside argument, newspapers do when they decide which op-ed writers to allow and not allow on their website. So when I was a little confused, because when I look at 230C, the protection it gives seems to be that a provider or user shall not be treated as the publisher or speaker of the information. Is that right? Is that the protection? Yes, that is what it said. And this Court and I think at least four other circuits have said that what that means is, and for reasons that are explained at some length in the en banc decision in roommates and also in the various panel decisions in roommates, that the statute, that language provides an immunity for liability for the content supplied by third parties. That is, information content providers, as that term is defined in the statute. And the reason for that, this Court has explained, is that otherwise you would have companies like Twitter and the others identified by Judge Smith facing what Chief Judge Kaczynski said was death by 10,000 duck bites. That is, lawsuit after lawsuit, which we are not up to 10,000 yet in this circuit, but we are certainly moving right along. Every time an act of terrorism is committed in the world, some lawsuit is filed against Twitter or Google or Facebook or often all three of them for liability for having allowed, supposedly, somebody associated with that organization, affiliated with the organization, from having an account in which the content complained of in this complaint is published. Do you agree with Judge Oreck that the very fact of permitting someone to establish an account is an act of publication, acting as a publisher, better said? Absolutely. And that would be true even if the suit, unlike this case, the reason why there was a complaint about not excluding somebody or some groups had nothing to do with the content. Here, of course, the whole point of regulating accounts is to regulate content on the platform. This is not a complaint that Twitter is failing to exclude every prime numbered account holder. This is failing to exclude supporters of ISIS specifically because of the content of their messages. But what if Twitter sent them, everybody in ISIS gets a free phone so that they can access Twitter better? I mean, Facebook is doing that in Africa, right? Everybody gets a free laptop so you can get onto Facebook. So would providing a free phone, which is necessary to access Twitter, would that be, would they be in for that? So I'm divorcing Section 230 from whether or not there is, in fact, a violation of the ATA by doing that. But focusing, as I think, Judge Akuta, you're asking about whether Section 230 applies. Section 230, Congress has not thought it necessary to, for example, immunize companies that provide megaphones or walkie-talkies or telephones for the content of messages that are supplied. What's the difference between an account? I'm going to give you all a free account. I'm going to give you all a free phone so you can use the account. So the salient point here, I think, is that what Twitter is doing and what courts, particularly the New York Court of Appeals in the Stratton-Oakmont case that caused Congress to, that precipitated an enactment, was holding interactive computer service providers like Twitter, in that case it was Prodigy and there was also a case involving CompuServe, is applying publisher liability, liability as a publisher for things that account holders were saying and doing on their accounts. To my knowledge, there haven't been, Al, any verdicts or judgments holding Verizon liable because I issued a defamatory remark on my Verizon phone. If that were to occur, the American Telephone case, which the parties cite in the briefs and the cases reflect, suggests that there is a kind of common carrier liability in those circumstances. But if it weren't the case, that would be a problem Congress would have to address. The walkie-talkie provider or the, you know, I'm just giving you a tool, whether it's a laptop, a telephone, a megaphone. Or an account, right? No. Why is that? Doesn't the logic carry the same way? No, it doesn't. Because what the courts whose decisions precipitated enactment of Section 230 were concerned about were judgments that providing an account on a publishing platform, that's what Twitter is, was being analogized for civil liability purposes, like providing someone the right to publish, to write and publish an article or an op-ed on a newspaper or in a book. That is, the courts were applying liability based on a publisher's duty to what the courts found was the analogous circumstance in which you are hosting a platform for expression. In this case, it was an Internet platform, but the analogy was to the traditional print television platforms. Mr. Waxman, I looked at it sort of, I think, the way you probably are looking at it. Let's first separate the two. Let's not worry about the CDA immunity and just look at the Anti-Terrorism Act. Don't you agree that if you look at it and you say, what is Twitter providing? They're providing the means and methods of command and control. Can they do anything about it? I don't know. Maybe they can. But you can separate that from content and say, yes, we provided the means and methods. Now you turn to the CDA and say, well, is there a publisher exception for that? Well, to the extent it relates to content, sure. And maybe even proximate cause is a problem when you just open an account. But once you know how the system is being used, to allow it to continue to be used that way, if you could do something about it, isn't that a problem under the Terrorism Act? Isn't that providing meaningful support? Are you asking me whether that's in and of itself a violation of the Terrorism Act? Or are you asking whether it's not covered by 230? No, I'm not. The former. The former. Would that be a violation of the Anti-Terrorism Act? You know what it's being used for. It's a means of command and control, and you could do something about it. Would that be a violation of the Anti-Terrorism Act? Well, the answer depends on the answer to the question that Judge Okuda asked my friend on the other side, which is you have a civil remedy. A private party has a civil remedy if the private party was injured by reason of an act of international terrorism. Now, I'll leave aside the causation issues because I think your question goes to whether or not, if Section 230 didn't apply to that utterly content-based decision by Twitter, that is to allow them to knowingly allow them to continue to broadcast, you know, But leaving aside the fact that that's the heartland of what Section 230 defends, if the question is, is that an act of international terrorism, the answer is there is nothing in the language of the statute, and with all due respect to my friend's suggestion that a violation of 2339A or B is ipso facto an act of international terrorism, it plainly is not. The act of international terrorism is a specifically defined term in the statute. We fully, the parties fully briefed this in front of Judge Orrick. He didn't see a need to address that point and ruled on alternative grounds. But in order, Judge McAuliffe, to establish liability under your hypothetical, they would have to show under 2331.1, which is where act of international terrorism is defined, that Twitter engaged in activities that, A, involved violent acts or acts dangerous to human life that violate the criminal laws, and, B, that Twitter appear to have intended to intimidate or coerce a civilian population. Now, the operation of a platform for freedom of expression, a general purpose offered to everyone who complies with the Twitter rules, knowing that out of the billions of account holders there will be a handful or some hundred people who will be using it for inappropriate, illegal, violent purposes, doesn't satisfy the definition of an act of international, of commission of an act of international terrorism. But the opposing counsel seems to concede that what Twitter was doing doesn't meet that definition, but says we should follow other courts, other circuits that have said that doesn't matter, a violation of 2339A or B amounts to an act of international terrorism. So why shouldn't we follow those circuits that ‑‑ Well, first of all, first of all, there is no circuit that has so held. Perhaps my friend is referring to the Boyam case or in the Seventh Circuit or the Rothstein case in the Second Circuit. The Rothstein case ‑‑ the Second Circuit, no place held that civil liability attached simply by establishing that something in a criminal prosecution would violate 2339B or A. And Boyam didn't either. Judge, you know, we disagree with, you know, for a number of reasons with the Second Circuit, Judge Posner's decision for the Seventh Circuit in Boyam on a variety of grounds, but he carefully parsed every element of 2331.1 that Your Honor addressed. There is no circuit. There is a district court decision, I believe Judge Kogan's decision, I'm blanking on the name, the Lindy v. Arab Bank case, which is now pending in the Second Circuit, where he did say that. He said, I'm not going to instruct the jury on the elements of 2331 because I find that this alleged a violation of the material support provision. That was wrong, and it would be wrong for you to follow that. Is your answer to Judge Ikuda with respect to the construction of the statute, an ATA, is that your answer to the Humanitarian Law Project language, which you know is very broad, saying that providing foreign terrorist groups with material support in any form furthers terrorism? Is that your answer? That's part of my answer. Part of my answer is that the Humanitarian Law Project involved the question of criminal liability where causation is not relevant and nor is the definition of an act of international terrorism relevant. And the other point, if I just may, is that as this Court pointed out in the al-Haramain case, as the Supreme Court itself was very careful, given the First Amendment issues that are embedded in a liability under the material support provision, and indeed that is a part of 2339b. It's the very last subsection where Congress said this will never apply if it otherwise would be violative of the First Amendment. That's the other part of my answer. Even the Supreme Court said this is a decision, the logic of this decision may not carry into other circumstances because of the serious First Amendment issues involved. Let me just quickly ask you to address the by reason of language. This past term, the Supreme Court has started to develop this federal common law of proximate cause in Bank of America v. Miami and City of Los Angeles v. Mendez and seems to say that there has to be some direct relation. Should we read that into the by reason of? Is there any basis for doing that or is there any other link? Yes, you should do that and there is very definitely a much more substantial link. As we pointed out in our brief, the by reason of language has a particularly clear and direct provenance. That is, that was the language that was used to establish civil liability in the Sherman Act. It was deliberately used in the Clayton Act. It was then used in RICO and it is now used in the ATA, in the civil remedy provision. The Supreme Court has held in the Holmes case, in the Anza case, in the Hemi Group case, and this Court in the Couch case has recognized that by reason of goes beyond, imports something beyond reasonable foreseeability and in the Supreme Court's repeated language that it requires showing of, quote, some direct relationship between the injury asserted and the injurious conduct alleged. And, of course, it was the basis, that was the basis for the Supreme Court's doctrine that in the antitrust context, the original context in which this language was used, that only direct purchasers, not indirect purchasers, are entitled to, entitled to invoke a remedy under the antitrust laws. Roberts. I, in lesser minds, I was going to ask it more simply and say, isn't proximate cause the easiest way to resolve this case, this particular case, the lack of proximate causation? I can't tell the Court what wouldn't be easier. I can say that I think it is terribly important for the, hearkening back to Judge Kaczynski's description of the death by 10,000 duck bites, this case is a paradigmatic example of this. This was the very first one of these cases brought against Twitter or Google or Facebook. But it is generating, you know, many, many, many copycat cases. And unless these companies are going to, it is very important for this Court to speak clearly and I think quite emphatically on the Section 230 grounds. Otherwise, we are going to be eaten to death by 10,000 duck bites. Roberts. Other questions? Thank you, Mr. Waxman. Counsel, we're going to give you some generous time to respond. Thank you. As a matter of fact, I want to be sure. How much time did we give him to start with? Did we give him just 10 minutes? Okay. All right. I just want to be sure. Okay. Go ahead, counsel. I appreciate the extra time, Your Honor. Okay. Turning to the by reason language, that seems to be something that we're focusing on. I think it's important to understand that Congress intended the Anti-Titration Act to be a fairly expansive statute and that the by reason of language has been distinguished in the context of the ATA from the way that language might be used in other cases. What's the leading case that you would have us rely on? I don't have it in front of me, Your Honor. I'm sorry. I'm happy to supplement the court if that's something the court would want. But I think the courts, and I know one of them is the Lindy v. Arabank case. Is that the district court case that's pending before the Second Circuit? It's pending before the Second Circuit, but mostly on other issues. I don't think that's a central issue, if an issue at all. But the reason to read that language expansively here is that it's going to be almost impossible to ever show a direct connection between support that someone gives to a terrorist organization and an attack that that organization carries out. And so if you require some – And why, after you've pleaded your second amended complaint, that's the best you can do, right? In terms of approximate causation, that's it, right? You win or lose on the sack, right? We don't have any further direct allegations between Twitter and the attack here, but I don't think we can overstate – So it gets down to, again, the fact that the accounts were opened, and your mind knowing that these were ISIS people who opened the accounts. It doesn't matter what they use them for, just that they opened them. You say there's a duty under the ATA to stop that, and if they don't, they're liable. No, for personal causation, you do have to look at the content of the accounts, and that's why we – Then you're killed under 230, right? No, because I think under Barnes and even under the Internet Brands case – Those cases are – those are clearly distinguishable, are they not, from this case? I don't think that's right. I think those cases stand for the proposition that if you're looking at contents solely for purposes of demonstrating causation and not demonstrating the underlying breach of duty, then that's permissible. Content was certainly a central part in the Barnes case, and just because – I think it would be a far too narrow interpretation of Barnes to say, well, that's a promissory estoppel case, and this involves a different type of claim, and so it doesn't apply here. I think it stands for a much broader principle. And I think if you require a more – going back to the directness requirement, if you require showing that material support led to a specific attack, that essentially renders the Anti-Terrorism Act a dead letter, and I don't think we'll be seeing any further cases under that statute. It might be a dead letter for claims that you just opened an account, but if somebody is able to show – if you were able to allege that Twitter knew that Abu opened an account and they used it to communicate with somebody else who directed him to kill these people, you've got a whole different story there. But you don't say that. The content is essential to your claim, but it's kind of a wink and a nod to have this survive. Twitter knew what ISIS was, and it knew that by giving material support to ISIS, it was going to help it carry out terrorist attacks. And similarly – It's that material support that troubles me a little bit, because once you say content, then you have a problem, don't you? If it's materiel, means and methods of exercising command and control, content, and what was said, nature of comments, not relevant. It's the Jeep, not how they drove it. It's the Jeep. Don't you run into trouble once you say it's what they say? No, because I think it's really based on when did the breach of the duty occur. And the material support provisions of the ATA were violated the instant that the tool was given to the terrorist. If you give money to a terrorist organization, you have instantly violated 2339A and 2339B. It doesn't matter if they spend that money. Money is fungible, and the Court's made that clear. But money and instruments of communication are quite different, are they not? Well, they could be sold for money, and the Supreme Court has said that if you give anything to a terrorist organization, it helps them facilitate terrorist attacks. And I don't think there can be any doubt, given how important these Twitter accounts were to ISIS, that they played a material role in all of the attacks that they carried out, including the one in which Mr. Fields and Mr. Creech were killed. Other questions by myself? No, thank you. All right, we thank you both for your argument. Thank you. The case just argued is submitted, and the Court stands in recess for the day.
judges: M. Smith, Ikuta, McAuliffe